SALTER, J.
In this Anyfe-progeny[1] case, the jury returned a special interrogatory verdict in favor of the tobacco company defendants, appellees here, based on the affirmative defense that the plaintiffs, Ms. Frazier’s, lawsuit was barred by the four-year statute of limitations, section 95.11(3), Florida Statutes (1994). Ms. Frazier has appealed the denial of her motions for directed verdict and new trial regarding the limitations issue. Appellees Philip Morris and R.J. Reynolds have cross-appealed the circuit court’s ruling granting preclusive effect to certain findings by the Supreme Court of Florida in Engle and the trial court’s refusal to instruct the jury regarding the twelve-year statute of repose applicable to fraud claims, section 95.031(2)(a), Florida Statutes (1994).
In the direct appeal, we reverse and remand the case for a new trial for two independently sufficient reasons. First, there was no competent record evidence that “the accumulated effects of the substance [had] manifested] in a way which supplie[d to Ms. Frazier] some evidence of the causal relationship to the manufactured product”[2] before the undisputed limitations bar date of May 5, 1990. For this reason, Ms. Frazier’s motion for a directed verdict on the statute of limitations issue should have been granted.
Second, Ms. Frazier made and preserved meritorious objections to the court’s adoption of the jury instruction and special interrogatory verdict question submitted by the appellees on the statute of limitations defense. Although this issue becomes moot on the basis of our ruling on the direction of a verdict, we conclude that Ms. Frazier’s motion for a new trial was well taken on this issue as well.
In the cross appeal, we affirm the trial court’s rulings on both issues.
I. Evidence and Rulings at Trial
A. Tobacco Use and Medical History
At the time of the trial in 2010, Ms. Frazier was 65 years old. She began smoking cigarettes at the age of 14 or 15. After numerous attempts to quit smoking, she was successful in 1992, with medical assistance and nicotine patches. Ms. Frazier’s medical records disclosed medical treatment for respiratory complaints beginning in approximately 1986. Ms. Frazier and those records described a bout with pneumonia:
Q: It was pointed out in the opening statement by [defense counsel] that in approximately 1986, before you came to Florida, that you had a bout of pneumonia. Do you remember that?
A: Yes.
Q: Did you associate the pneumonia with your cigarette smoking?
A: No.
*940 Q: Did any doctor make a connection to you between pneumonia and cigarette smoking?
A: No.
Q: Did you stop smoking for a period of time when you had the pneumonia and pleurisy?
A: Yes.
Q: And when you got better from the pneumonia and the pleurisy, what did you do in the terms of smoking?
A: I started smoking again.
Q: Had you actually had pneumonia at one other time when you were a young woman?
A: I had had pneumonia when I believe I was 21. I’d never been hospitalized for pneumonia.
Q: And did you make any connection between the pneumonia that you had when you were 21 and your cigarette smoking?
A: No.
Q: Did anyone advise you or tell you that you should believe that cigarette smoking had anything to do with the pneumonia when you were 21?
A: No.
In March and April 1987, Ms. Frazier returned to the emergency room with continued complaints of a cough and pain in her ribs. The treating physician diagnosed right middle lobe pneumonia and advised her to return for an x-ray if the symptoms continued. On a second visit, the same doctor diagnosed “recurrent pneumonia and/or bronchitis.” During the first visit, the doctor prescribed erythro-mycin; subsequently Ms. Frazier was switched to doxycycline for the infection and Percocet for the cough. Importantly, during these visits the treating physician did not refer her to a pulmonologist or order specialized tests for investigation of a possible condition more serious than a short-term infection.
Thereafter, Ms. Frazier moved from Massachusetts to Florida. In October 1987, she visited a walk-in clinic because she had a “bad cold” and a “temperature.” In her trial testimony, she described the iricident:
Q: Up to that point in your life, had you ever thought to yourself that anything that you were experiencing was or even could be asthma?
A: Never. No. No.
Q: But at the walk-in clinic, they told you you’d had an asthma attack?
A: Right, he told me I had asthma.
Q: Did you agree with that?
A: No.
Q: What did you think?
A: I thought I had bronchitis. I thought I had a bad cold. I had a temperature. You know, I had all — I’d had bronchitis before. I mean as far as I was concerned — not even as far as I was concerned. I had bronchitis.
They didn’t do any testing of any sort that I had done at the hospital in 1991 when I had the asthma attack. They didn’t do a chest x-ray. They didn’t do what’s called an arterial blood gas where they check the oxygen in your blood.
They didn’t give me a nebulizer treatment which is what they did when I had the asthma attack.
They didn’t do anything that would have made me think that I had anything but bronchitis. They gave me an antibiotic.
They didn’t give me inhalers. I mean they didn’t do anything that would — so I didn’t — I didn’t think it was anything different.
*941 Q: But it sounds like you’ve got a pretty good understanding now of blood gases and inhalers and some of these other medical terms that you’ve just referenced in answer to my last question. When did you learn those things?
A: Unfortunately I learned them after I had an asthma attack in 1991 and then had my lung problems, my emphysema and the lung transplant and everything, years.
Q: Just so that there’s no misunderstanding about this, the knowledge base that you have now about respiratory illness, diagnosis, and treatment is something that you’ve learned since it’s been confirmed that you were sick?
A: Right. Exactly. Yes.
Q: Did you know any of that back in 1987, 1986, or any of those time frames? A: No, I didn’t know any. I didn’t know any of that.
Ms. Frazier’s next relevant medical incident occurred in February 1991 — a time well after the statute of limitations bar date. She had developed an upper respiratory infection (she had a sore throat, nasal congestion, and a fever of 102 degrees). She went to an urgent care center and was then admitted to a hospital. The radiologist’s report on a chest x-ray taken at that time indicated “changes of COPD,”[3] and Ms. Frazier was told that she had asthma. For the first time, she was referred to a pulmonologist on February 21, 1991. The pulmonologist concluded that Ms. Frazier had an asthmatic bronchitis, but his report expressed a concern for “the possibility of some underlying lung disease on a more chronic basis in view of [her] significant smoking history.” The pulmonologist’s consultation report also states that “[s]he denies any history of emphysema or chronic bronchitis,” a statement that is not contradicted by the record in any respect.
In a follow-up in April 1991, the pulmo-nologist reported that the bronchitis had resolved. In a further follow-up in August 1991, the pulmonologist’s records noted tobacco addiction and (for the first time, following the tests ordered in February) “underlying COPD,” and this was noted again during a visit in February 1992. After a follow-up in July 1992, Ms. Frazier’s pulmonologist reported that she was a patient “with underlying COPD secondary to her long term tobacco use for the last 30 years.” Over the course of several years, the damage to Ms. Frazier’s lungs was classified as “severe COPD” and as emphysema, and by 2001 she was under evaluation for bilateral lung transplants (which she later received).
B. Dr. Schroeder’s Testimony
Before trial, Ms. Frazier sought an order “to preclude speculative testimony of Defendant’s expert pulmonologist, Eric Schroeder, M.D., concerning the time frame during which [Ms. Frazier] developed COPD.” In her motion, Ms. Frazier argued that “Dr. Schroeder in this case purports to use the results from a pulmonary function test (PFT) performed on the plaintiff in 1991 to speculate as to what her lung function would have been four to six years earlier, even though no such tests were performed on the plaintiff before *942 1991 and no physician, even physicians treating her for other respiratory ailments, diagnosed her as having COPD before 1991.” The trial court granted the motion in part, precluding direct testimony regarding Ms. Frazier’s state of mind, or her actual or constructive knowledge of her condition.
At trial, however, Dr. Schroeder was permitted to render opinions (over objection), purportedly because of his expertise in pulmonary medicine, that Ms. Frazier’s 1986 and 1987 emergency room visits for pneumonia and bronchitis were actually manifestations of COPD and emphysema through “signs and symptoms that would have been apparent to the patient herself.” He also testified, based on Ms. Frazier’s 1991 chest x-rays (ordered and evaluated well after the applicable statute of limitations bar date) and her first PFT report from 1993, that it was possible to deduce from them that she must have had COPD in the 1980s. He admitted, however, that this opinion was based on his own experience rather than any scientific research or medical literature.
Dr. Schroeder’s testimony regarding Ms. Frazier’s emergency room visit for bronchitis in 1987 — based on a licensed physician’s report with no mention of any possibility of COPD or emphysema, or even a referral for a PFT or consultation with a pulmonologist — is illustrative:
Q: Now, was this episode documented by these records in 1987 what you characterize or what you would diagnose as an exacerbation of COPD?
Plaintiffs attorney: Objection, form, leading.
The Court: Sustained.
Q: Well, what was Ms. Frazier suffering from that reflected in the records we’ve just shown the jury based from March and April of 1987?
A. In my opinion, both of these emergency department visits were due to acute exacerbations of COPD.
Q: And explain why that is your opinion.
A: Well, my opinion, number one, is I believe that Mrs. Frazier during that period of time had definite COPD. And when you look at the first emergency room department visit back in March, the emergency doctor, Dr. Lincoln, indicated that when he listened to her lungs he heard a number of abnormal sounds, including wheezing.
Q: Let me put that up so you can show that one. That’s — you’re referring to this examination here in the center?
A: That’s correct.
Q: Okay. Go ahead. I’m sorry to interrupt you, Doctor.
A: I think this one observation is a very important point in the examination because typically when someone develops acute bronchitis, they may feel bad, they’ll have a lot of, you know, just general symptoms.
But when you listen to someone’s lungs who does not have any underlying lung disease, they just simply catch a cold, get bronchitis, you generally have a perfectly normal chest exam. When you listen to them, you hear normal air movement, no extra sounds.
And whenever you hear the presence of wheezing, that is an indication that there is an underlying lung condition present that typically is being aggravated by the acute bronchitis.
And I think this presentation is rather classic to COPD exacerbation. And like many other COPD exacerbations, oftentimes they recur and they’re more likely to recur shortly after a prior acute exacerbation.
*943 So the fact that she got better for awhile with the first antibiotic and then had to have another course of antibiotics and then again got a little better and then came back again, that would be typically what I would expect to see in someone with COPD with an acute exacerbation.
The record establishes that Dr. Schroeder’s knowledge and opinions were based on all of Ms. Frazier’s medical records, through and including her actual diagnosis with COPD and her lung transplants. Dr. Schroeder did not testify that Dr. Lincoln (the emergency room physician who diagnosed and treated Ms. Frazier’s pneumonia and bronchitis in 1987) misdiagnosed Ms. Frazier, or that any competent physician should have known then what Dr. Schroeder said seemed apparent to him 28 years later. Dr. Schroeder neither listened to Ms. Frazier’s lungs in 1987 nor discussed Ms. Frazier’s case with Dr. Lincoln. Nor did Dr. Schroeder testify that Ms. Frazier herself, a hairdresser with no medical training whatsoever, should have surmised that the doctor treating her in 1987 was missing the “manifestation” of a condition more sinister and chronic than pneumonia or bronchitis.
C. Jury Instruction Regarding the Statute of Limitations
The parties disagreed at the charge conference regarding the form of a jury instruction on the statute of limitations affirmative defense raised by the appellees. The pertinent excerpts from the instruction proposed by the appellees are:
Defendants do not need to prove that Ms. Frazier was actually diagnosed with a smoking-related injury prior to May 5, 1990 in order to prevail on this issue. For purposes of this issue, the critical event is not when a disease or medical condition was actually diagnosed by a physician, but when the disease or medical condition first manifested itself.
Ms. Frazier knew or should have known that there was a reasonable possibility that her injury was caused by cigarette smoking if her injury manifested itself in a way that supplied some evidence of a causal relationship to cigarette smoking.
Ms. Frazier sought an instruction on the limitations issue which included, in pertinent part:
On these defenses, the issues for your determination are:
1) whether the Plaintiff knew or should in the exercise of reasonable care have known, on or before May 5, 1990, both that she had emphysema and that there was a causal connection between her smoking and her emphysema; and
2) whether the Plaintiff knew or should in the exercise of reasonable care have known, on or before May 5, 1990, both that she had the COPD and that there was a causal connection between her smoking and her COPD.
During the charge conference, the trial court considered the arguments by both sides — and both counsel characterized this as a “case-defining” issue. Each side submitted a memorandum of law regarding its proposed instruction on the issue. Ultimately, the trial court gave an instruction on limitations which included this formulation:
Depending on your resolution of the issues that I just described to you,[4] the next issue for your determination may be whether plaintiff knew or, by the use *944 of reasonable care, should have known before May 5th, 1990, that she had been injured and that there was a causal connection between her smoking and her injury. Defendants must prove this issue by the greater weight of the evidence. Defendants do not need to prove that plaintiff was actually diagnosed with, a smoking-related injury prior to May 5th, 1990, in order to prevail on this issue.
For purposes of this issue, the critical event is not when a disease or medical condition was actually diagnosed by a physician but when the disease or medical condition first manifested itself. Plaintiff knew or should have known that there was a causal connection between her smoking and her injury if her injury manifested itself in a way that supplied some evidence of a causal relationship to cigarette smoking.
(Footnote added).
Finally, the trial court approved a verdict form that posed this interrogatory on the limitations issue, as proposed by the appellees:
Did Plaintiff know, or should she have known in the exercise of reasonable care, prior to May 5, 1990, that she had been injured and that there was a causal connection between her smoking and her having been injured?
Yes_No_
Ms. Frazier had asked for two nearly-identical interrogatories on the verdict form, one for emphysema and one for COPD. The latter interrogatory would have asked:
On or before May 5, 1990, did Plaintiff PHYLLIS FRAZIER know, or should she in the exercise of reasonable care have known, both that she had COPD and that there was a causal connection between her smoking and her having developed COPD?
Yes_No_
D. Verdict and Post-Trial Motions
After deliberations, the jury returned a verdict determining that Ms. Frazier was addicted to cigarettes containing nicotine and that her addiction was a legal cause of her COPD/emphysema. On the limitations interrogatory, however, the jury found that Ms. Frazier knew or should have known before May 5, 1990, that she had been injured and that there was a causal connection between her smoking and her having been injured. As directed by the verdict form based on that finding, the jury did not proceed to answer the remaining interrogatories regarding liability, reliance, percentage responsibility, economic and non-economic damages, or liability for punitive damages.
Ms. Frazier filed post-trial motions seeking judgment in accordance with her motion for a directed verdict on the limitations issue and for a new trial, which were denied. Final judgment was entered for each appellee, and this appeal and cross-appeal followed.
II. Analysis
A. Limitations Date
In Engle, the Supreme Court of Florida held that “[t]he critical event is not when an illness was actually diagnosed by a physician, but when the disease or condition manifested itself.” 945 So.2d at 1276. The context involved a class membership cutoff date rather than a limitations date, but Florida’s decisional law regarding so-called “creeping diseases” such as asbestosis [5] or silicosis[6] is consistent with that formulation.
*945 In Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 934 (Fla.2000), the Supreme Court of Florida held that, in a product liability case involving a latent or “creeping” disease, “the cause of action accrues when the accumulated effects of the deleterious substance manifest themselves to the claimant in a way which supplies some evidence of a causal relationship to the manufactured product.” That Court reaffirmed such a test recently in American Optical Corp. v. Spiewak, 73 So.3d 120, 126 (Fla.2011), when it held:
With regard to asbestos-related diseases, we have held that an action accrues when the accumulated effects of the substance manifest in a way which supplies some evidence of the causal relationship to the manufactured product. See Celotex Corp. v. Copeland, 471 So.2d 533, 539 (Fla.1985).[7]
(Footnote added).
In assessing the applicability of the statute of repose to a cause of action for asbestos-related injuries, this court held the statute unconstitutional because of the “long delay in manifestation of symptoms that will support a medical diagnosis of injury.” Owens-Corning v. Corcoran, 679 So.2d 291, 294-95 (Fla. 3d DCA 1996). Plainly, many symptoms or effects that might later develop to become a compensa-ble injury attributable to smoking—shortness of breath, or persistent coughing, for example—do not in isolation provide a sufficient legal basis for initiating a lawsuit against a tobacco company. Applying the teaching of Engle and the other “creeping disease” cases, these medically—and prae-tieally-ambiguous “manifestations” do not create an issue of fact for resolution by a jury or the court.
Rather, the “manifestations” that are pertinent are symptoms or effects that actually disclose that the prospective claimant is suffering from a disease or medical condition caused by tobacco use, and which are thus sufficient to assert a cause of action against the responsible manufacturer(s). In the case at hand, Ms. Frazier could not have filed a non-frivolous lawsuit against the appellees in 1986 on a theory that her symptoms and pneumonia were compensable results of her addiction to tobacco, nor could she have filed such a lawsuit in 1987 for “pneumonia and/or bronchitis.” It was not until February 1991 that a set of tests and a referral adduced competent evidence that COPD/emphysema was a likely suspect.
Similarly, in Engle the Supreme Court looked at an early 1997 medical report that included a reference to Ms. Della Vecchia’s past medical history of COPD and significant hypertension to confirm her eligibility for class membership. 945 So.2d at 1276. While the accrual date for a disease caused by tobacco addiction may be prior to “formal diagnosis” as that term was used in Engle, certainly that date would not be before a medical professional treating the patient noted at least some suspicion that the presenting “manifestations” might require tests to rule out that disease.[8]
*946 We reject 'as both unworkable and unfair an interpretation of the “creeping disease” case law that would allow a defense expert to engage in a belated armchair analysis and to opine many years later that the claimant’s claim is barred because her treating physician should have investigated the creeping, as yet ⅞⅞-mani-fested disease. Dr. Schroeder’s testimony is not competent or relevant evidence on the question of what Ms. Frazier and her doctors knew and when they knew it vis-a-vis COPD/emphysema; it is simply a post hoc conclusion confirming what was learned in and after February 1991. Dr. Schroeder’s opinion was purely speculative, and thus barred by the trial court’s ruling on Ms. Frazier’s pretrial motion, insofar as it purported to opine on what “would have been apparent to the patient herself.”
In Marsh v. Valyou, 977 So.2d 543 (Fla. 2007), the Supreme Court of Florida addressed the boundaries of expert testimony under the Florida Evidence Code. In the present case, Dr. Schroeder conceded that his inferences from the 1991 (and later) x-rays, were not supported by any x-rays, pulmonary function tests, or direct observations obtained before the May 5, 1990, limitations bar date, and were not based on any generally accepted medical or scientific principles or methodologies. But neither were his conclusions a “pure opinion” of the kind addressed in Marsh.
The issue was not whether Ms. Frazier “had” the creeping, stealthy disease of COPD/emphysema before May 5, 1990; the issue was whether she knew, or reasonably should have known, enough to permit her to commence a non-frivolous tort lawsuit against the appellees on the basis of those physical, observable, patent symptoms and effects (“manifestations”) before that date. And Dr. Schroeder had no competent evidence before him from which to hazard his own guesses regarding Ms. Frazier’s knowledge. Here, as in Young-Chin v. City of Homestead, 597 So.2d 879, 882 (Fla. 3d DCA 1992), a medical expert may not furnish a prognosis “from an inference” lacking appropriate supporting physical evidence.
The trial court correctly granted Ms. Frazier’s motion in limine regarding Dr. Schroeder’s testimony, and Dr. Schroeder and the appellees should not have ventured beyond that ruling.
B. Jury Instruction and Verdict Form Regarding Limitations
Although our conclusions regarding the pertinent accrual date and the absence of competent evidence to prove a date before May 5, 1990, are dispositive of this appeal, we also address Ms. Frazier’s legal arguments directed to the form of jury instruction and verdict form relating to the statute of limitations defense. While acknowledging that the appellees proposed, and the trial court accepted, a statute of limitations form of instruction adapted from Florida Standard Jury Instructions in Civil Cases 402.14.a and Carter, the plaintiff in Carter did not raise and preserve the objections raised in the trial court and here by Ms. Frazier. Regarding the standard instruction and the variation proposed by the appellees and given by the trial court, we conclude that the appel- *947 lees’ focus on “injury” is confusing in this case and more pertinent to a products liability case involving a bodily injury other than a disease. The limitations issue in this Engle-progeny case should have focused on the manifestations of Ms. Frazier’s COPD/emphysema and her awareness or lack of awareness that those manifestations and the disease itself were caused by her addiction to, and use of, cigarettes. Using “disease” and “injury” in the course of the instruction suggested that the terms are different.
This problem came to the forefront in the recent case of Philip Morris USA, Inc. v. Barbanell, — So.3d -, 2012 WL 555402 (Fla. 4th DCA 2012), another Engle-progeny case. The instruction and form of verdict on the limitations issue in Barbanell were based in part on Carter (using knowledge of an “injury” prior to May 5,1990, as the initial question). However, the verdict included a further interrogatory asking whether the plaintiff knew or should have known “prior to May 5, 1990, that she suffered from emphysema, a form of COPD, and that there was a reasonable possibility that her injury was caused by cigarette smoking.” The jury returned a verdict answering “yes” to the “knowledge of injury” question (a defense verdict), and “no” on the COPD/emphyse-ma question (but for the preceding response, a plaintiffs verdict). The trial court declined to direct a defense verdict on these two responses, but the Fourth District concluded that this was error and remanded for the entry of a judgment in favor of the defendant. The concurring opinion noted that counsel for the plaintiff had not addressed the “puzzling” differences between the two limitations interrogatories and the jury’s verdict on each. Barbanell, — So.3d at-(Hazouri, J., concurring specially).
In the present case, Ms. Frazier’s counsel raised and specifically objected to the “knowledge of injury” form of instruction and corresponding interrogatory on the verdict form. Ms. Frazier presented competing forms of the limitations instruction and verdict forms, thereby preserving her position on this issue.
C. Issues on Cross-Appeal
As noted at the outset, we reject the appellees’ arguments regarding their cross-appeal. This court has already acknowledged the preclusive effect of the Phase I findings in Engle.[9] Three other District Courts have done so as well.[10]
The appellees also argue that Florida’s twelve year statute of repose relating to fraud claims, section 95.031(2)(a), Florida Statutes (1994), barred Ms. Frazier’s cause of action for fraudulent concealment or conspiracy to conceal. The appellees contend that Ms. Frazier was obligated to prove that she relied upon a deceptive statement or omission after May 5, 1982 (twelve years before the Engle lawsuit began in the trial court). The trial court refused a jury instruction requested by the appellees on this point. We conclude that the last act done in furtherance of the alleged conspiracy fixes the pertinent date for purposes of commencement of the statute of repose, and we conclude that Ms. Frazier introduced evidence of deceptive statements or omissions occurring after May 5, 1982. Laschke v. Brown & Williamson Tobacco Corp., 766 So.2d 1076, 1078 (Fla. 2d DCA 2000). We reject the appellees’ contention that Ms. Frazier was *948 obligated to show further or continued reliance upon the alleged last act in furtherance of the conspiracy. The judgment below is thus affirmed as to each of the issues raised in the cross-appeal.
III. Conclusion
In the direct appeal, Ms. Frazier relies upon a carefully-protected record on the statute of limitations evidence and on the jury instruction and verdict forms. Regarding the evidence, and in particular the speculative, clear-in-hindsight-only testimony of Dr. Schroeder, Ms. Frazier sought and obtained an appropriate order in limine, and she objected as well. Dr. Schroeder could not and did not render competent testimony about what Ms. Frazier knew or might reasonably have known regarding the “manifestations” of her En-pfe-eligible COPD/emphysema and the causal relationship of those manifestations to the cigarettes produced by the appel-lees. He violated the order in limine as his testimony ventured into what was not “manifest” in 1986 and 1987, whether to Ms. Frazier or her treating physician. The manifestations of her COPD/emphyse-ma did not begin, on this record, until 1991, a date within the statutory limitations period.
Regarding the form of jury instructions and verdict form, Ms. Frazier challenged the forms proposed by the appellees and requested forms that would not mislead the jury into a belief that an “injury” of some undefined type — perhaps shortness of breath or an acute illness like pneumonia — might trigger the accrual of the four-year statute. In an Engle-progeny case such as this, there is no reason to open the door to such a possibility. The class certification order in Engle confined the class to Florida citizens and residents, and their survivors, “who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.” Engle, 945 So.2d at 1256. Ms. Frazier’s complaint further narrowed her “disease and medical condition” to COPD/emphyse-ma. The limitations instruction and the counterpart interrogatory on the verdict form should have been similarly limited, as Ms. Frazier proposed.[11] There was no evidence of other ®?,(/fe-qualified causes of action based on other diseases or medical conditions.
Finally, in the cross-appeal we find no error in the trial court’s ruling granting preclusive effect to the pertinent Phase I class findings from Engle or denying an instruction on the fraud statute of repose.
Reversed and remanded with instructions to grant Ms. Frazier a directed verdict on the statute of limitations issue, and for further proceedings in accordance with this opinion; affirmed as to all issues raised on cross-appeal by the appellees.

. Individual cases filed pursuant to Engle v. Liggett Group, Inc., 945 So.2d 1246, 1277 (Fla.2006).

. Am. Optical Corp. v. Williams, 73 So.3d 120, 126 (Fla.2011).

. "COPD” refers to "any one of a group of diseases comprising emphysema, bronchial asthma, chronic bronchitis, bronchiectasis, and cystic fibrosis,” Attorneys’ Dictionary of Medicine and Word Finder, C-211 (1993), and is marked by chronic obstruction of the bronchial tubes. Id. In Ms. Frazier’s case, the ultimate diagnosis was COPD/emphysema, a single tobacco-related disease that is one type of COPD. COPD, with no separate reference to emphysema, is among the diseases caused by smoking cigarettes according to the Engle Phase I class findings. Engle, 945 So.2d at 1276-77.

. These two issues were "(1) whether plaintiff was addicted to cigarettes containing nicotine and (2) if so, whether plaintiff's addiction to cigarettes was a legal cause of her COPD/em-physema.”

. Celotex Corp. v. Copeland, 471 So.2d 533 (Fla. 1985).

. Barnes v. Clark Sand Co., 721 So.2d 329 (Fla. 1st DCA 1998), approved sub nom. Pulmosan Safety Equip. Corp. v. Barnes, 752 So.2d 556 (Fla.2000).

. It should be noted, however, that the majority opinion in American Optical Corp. also states that "prior to the [Asbestos and Silica Compensation Fairness Act in 2005], a diagnosis of asbestos-related disease triggered the accrual of a cause of action.” 73 So.2d at 127.

.We conclude that "formal diagnosis” might not be an appropriate test in a case in which a medical professional notes the possibility or even likelihood of a chronic disease such as COPD and refers the patient to appropriate *946 lab tests and consultation with a specialist, but the patient ignores the medical advice. In such a case, the accrual date would be an issue of fact even though a “formal diagnosis” had not yet been made. Contrast such a case with Ms. Frazier’s, in which the pre-1991 records do not mention COPD or emphysema (or any other chronic tobacco-related disease) and do not order those tests or make the referral that would be appropriate to investigate further.

. See, e.g., Rey v. Philip Morris, Inc., 75 So.3d 378 (Fla. 3d DCA 2011).

. R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060 (Fla. 1st DCA 2010); R.J. Reynolds Tobacco Co. v. Brown, 70 So.3d 707 (Fla. 4th DCA 2011); and Brackett v. Lorillard Tobacco Co., 81 So.3d 636 (Fla. 5th DCA 2012).

. As already noted, separate instructions and verdict interrogatories were not necessary for "COPD” and "emphysema” in Ms. Frazier’s case. A single form addressing "COPD/em-physema” would have sufficed.