ROTHENBERG, J.
(dissenting).
Everett Belanger (“Mr.Belanger”), a longtime smoker with Chronic Obstructive Pulmonary Disease (“COPD”), filed a post- ' Engle[4] lawsuit against R.J. Reynolds Tobacco Co. (“R.J.Reynolds”). Based on the record evidence, the trial court entered final summary judgment in favor of R.J. Reynolds, finding that Mr. Belanger’s alleged cause of action was barred by the four-year statute.of limitations. The trial court concluded that Mr. Belanger’s cause of action accrued before the undisputed limitations bar date of May 5, 1990, as he had “an awareness, clear awareness ... that cigarettes were killing him” as of 1981. Specifically, the trial court stated:
I find that the plaintiff was aware of his injury ... at least in 1981, the day that he quit smoking cold turkey. He *604 had an awareness, clear awareness, in the transcript, that the cigarettes were killing him....
Here, I understand we don’t need a definitive diagnosis, but we have a very articulate plaintiff, who has a family history of people with smoking, and he’s a gentleman that had recovered from an addiction. He appeared to be very articulate in his deposition, aware of what was happening.
And he’s on vacation. He can’t enjoy his vacation; he is coughing. The worst coughing ever that he can remember. He is reaching for his cigarette and it is an epiphany. He realizes that the cigarettes are killing [him].
And, at that point, I find that there is no question that that is when the statute began to run ....
Based on the record evidence, reviewed in the light most favorable to Mr. Belan-ger, I would affirm the trial court’s order granting summary judgment in favor of R.J. Reynolds.

I. STANDARD OF REVIEW

We review the trial court’s order granting summary judgment de novo, Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001); Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). In reviewing the order, we “must consider the evidence in the record, including any supporting affidavits or documents, in the light most favorable to the non-moving party.” AJH Prop. Invs. Ltd. v. SunTrust Bank, 89 So.3d 948, 950 (Fla. 3d DCA 2012); see also Fla. R. Civ. P. 1.510(c). Therefore, the issue before this Court is whether the trial court erred by finding that the record evidence, when viewed in the light most favorable to Mr. Belanger, demonstrates that there is no genuine issue of material fact that he knew or reasonably should have known based on the manifestations of his physical, observable, and patent symptoms, that he had a disease or medical condition caused by cigarette use prior to May 5,1990.

II. THE UNDISPUTED EVIDENCE

The trial court found that Mr. Belanger knew or should have known he had a smoking related illness or medical condition prior to May 5, 1990. Although the majority has articulated some of the undisputed evidence, there is a great deal of evidence omitted. Because the omitted evidence supports the trial court’s conclusion, it will be included herein. The undisputed evidence relied on by the trial court is as follows.

A. Mr. Belanger’s tobacco use and worsening respiratory problems

Mr. Belanger, who was born in 1926 and started smoking at age ten, began to experience respiratory problems such as shortness of breath, coughing, and congestion at a young age. For example, as a teenager, Mr. Belanger experienced shortness of breath while playing sports and, in high school, respiratory problems prevented him from participating in the school band. Mr. Belanger continued to smoke, and these symptoms progressively worsened. In the 1960s, Mr. Belanger, a professional dancer, was unable to continue dancing professionally due to shortness of breath. As he explained, he was “puffing and puffing and puffing until the point where I couldn’t breathe anymore,” and after these “puffing” episodes, he would be “laid up in bed afterwards.”
Mr. Belanger also experienced heavy colds accompanied by not just a cough, but rather, what he identified as “smoker’s cough,” and in the 1980s, he repeatedly sought medical attention for his worsening respiratory problems. By his own ac *605 count, his shortness of breath got “worse and worse” in the 1970s and the 1980s. By 1981, Mr. Belanger’s respiratory problems had become so severe that he quit smoking “cold turkey.” Specifically, Mr. Belanger testified: “I was in the hotel coughing, choking, and that’s when I was reaching for a cigarette and coughing and I said to myself, how stupid I was, because what I was reaching for was killing me.” (emphasis added). Mr. Belanger characterized this episode as an “awakening.”

B. Mr. Belanger’s knowledge of the hazards associated with smoking cigarettes

By his own admission, Mr. Belanger knew as early as the mid-1960s that smoking was hazardous to his health. For example, he attributed both his mother’s death from lung disease in 1967 and his father’s death from heart disease in 1975 to smoking cigarettes. Thus, he knew cigarettes killed his mother, cigarettes killed his father, and, as stated earlier, in 1981, he stopped smoking cold turkey because he knew that cigarettes were killing him. Mr. Belanger also warned his partner about the dangers of smoking and encouraged him to stop smoking because “he was stealing time away from us every time he picked up a cigarette.”

C. The medical evidence

It is undisputed that Mr. Belanger had a chest x-ray in 1985 that showed significant radiographic changes associated with COPD. In 1992, when Mr. Belanger was referred for another chest x-ray, the radiologist, Dr. Borrero, indicated in his report that Mr. Belanger had “emphysema-tous bullae and chronic interstitial fibrotic changes seen predominately in the left lung.” In comparing this x-ray with the chest x-ray taken in 1985, Dr. Borrero noted that there were “no significant changes since prior examination.” It is undisputed that “emphysematous bullae” are associated with COPD and emphysema.
In 1994, Mr. Belanger was referred for a third chest x-ray, after which Dr. Borrero reported: “Extensive chronic changes are seen bilaterally. These consist of large bullae in the upper lobes bilaterally as well as in the left lower lobe as well as some chronic pleural thickening and calcification on the left side.... Changes are stable since exams dating back to 1988.”
Dr. Arthur Pitchenik, a pulmonologist and Mr. Belanger’s expert, acknowledged that the pulmonary function test performed on Mr. Belanger in September 1993 indicated that he was suffering from severe to very severe COPD, and the report indicated that Mr. Belanger had experienced worsening shortness of breath (dyspnea) “for years.”
R.J. Reynolds’s expert, Dr. Lawrence J. Cohen, a diagnostic radiologist, testified in his deposition that he conducted a “blind review” of Mr. Belanger’s medical records and imaging to determine “what disease entities may be present, what symptoma-tology was present and ... what the imaging showed.” Dr. Cohen’s review included reports as to the several chest x-rays performed on Mr. Belanger. Dr. Cohen noted that Dr. Schneider’s report concerning a chest x-ray he performed on Mr. Belan-ger in September 1991 reflects that Mr. Belanger had both emphysema and pneumonia. Additionally, Dr. Borrero’s March 1992 report stated that Mr. Belanger had “emphysematous bullae.” Dr. Cohen explained that, ■ “[I]f you have bullae, you have emphysema,” and the report is “suggestive of COPD” because of the bullae. Dr. Cohen also noted that Dr. Borrero’s report indicated that the March 1992 films were compared to films dating back to 1985, and Dr. Cohen found there were no *606 “significant changes since prior examination,” which, in Dr. Cohen’s opinion, means that the emphysematous bullae was present in 1985. The December 1994 chest x-ray and report issued by Dr. Borrero confirmed the earlier reports, finding the presence of “emphysematous bullae,” which Dr. Cohen testified meant that Mr. Belanger had COPD.
Dr. Cohen testified that “Mr. Belanger had radiographic signs of emphysema and COPD as far as back as 1985, as well as in 1988, and that after reviewing medical records and depositions, [Mr. Belanger] had symptoms consistent with COPD and emphysema.” Dr. Cohen also testified that, based on the symptoms Mr. Belanger was experiencing as early as 1981, Mr. Belan-ger
knew he had a problem because of his ongoing shortness of breath and dysp-nea, meaning shortness of breath on — on exertion, and knew he had a lung or chest disease problem. What it was — I don’t think he put a — had a name he could put on it or anyone actually described it for him, but I think he knew he had lung problems.
Dr. McGoohan, a family practitioner who had initialed Dr. Borrero’s 1992 report, testified in his deposition that he could not remember if Mr. Belanger was one of his patients or if he ever spoke to Mr. Belan-ger about the 1992 report. Dr. McGoohan did note, however, that because the 1992 report states that Mr. Belanger had em-physematous bullae, and that “[t]here is no significant change since the [1985] examinations,” the emphysematous bullae were present in 1985. Dr. McGoohan further testified that he “probably” would have marked Dr. Borrero’s report as “possible COPD,” and if Mr. Belanger was his patient, he would have most likely referred him to a pulmonologist for a definitive diagnosis.
Although the majority repeatedly states that Mr. Belanger testified “without contradiction,” it is important to note that, because Mr. Belanger has waited so long to file his lawsuit, most of his medical records have been destroyed. Although we will never know what Mr. Belanger told his doctors or what they told him, the evidence establishes that, based on what he did know, he should have known he was suffering from a smoking-related disease or illness.[5]
The undisputed evidence demonstrates that, from as far back as the 1960s, Mr. Belanger knew of the dangerous effects of cigarette smoking. His mother died of lung cancer in 1967 and his father died in 1975 from heart disease due to cigarette smoking. Mr. Belanger also saw the effect cigarette smoking was having on his own health long before he lost his parents due to their cigarette smoking. He could not play sports or play in the band while a teenager due to his difficulty breathing, and his respiratory problems continued to worsen. In the 1960s, while his mother was dying of lung cancer related to cigarette smoking, Mr. Belanger could no longer dance professionally due to his breathing difficulties. He also experienced what he identified as a “smoker’s cough” and heavy colds which caused him to cough violently. His respiratory problems had *607 become so severe by 1981, that he quit smoking “cold turkey” because, in his own words, he knew cigarettes were “killing” him. More importantly, even after he quit smoking in 1982, Mr. Belanger’s symptoms worsened. By 1993, he had severe to very severe COPD, where he could no longer walk a distance of fifty feet; he had difficulty breathing even at rest; and, at times, his breathing difficulties resulted in him being confined to his bed.
Mr. Belanger’s awareness that cigarette smoking was killing him in 1981, coupled with the worsening of the symptoms even after he quit smoking in 1981, and the chest x-rays taken in 1985 and 1992 showing “scarring” on his lungs, “emphysema-tous bullae,” and “chronic interstitial fi-brotic changes,” which are radiographic evidence of COPD, certainly put Mr. Be-langer on notice that he had an actionable smoking-related illness or disease. The manifestations of his illness were obvious, they continued to worsen, and Mr. Belan-ger recognized how serious they were. The fact he waited for a definitive diagnosis in 1993 was his choice and does not negate his awareness that he was suffering from a smoking-related illness or disease for many years. Importantly, his symptoms did not suddenly appear in 1994 or appreciably worsen because the unrefuted evidence is that radiological exams demonstrated “no significant changes from 1985 to 1994.”

III. THE APPLICABLE LAW

Initially, we note that, although the issue of when the plaintiff in a products liability action involving a creeping disease such as COPD knew or should have known he was suffering from the actionable injury is generally a fact issue for the jury to resolve, the Florida Supreme Court has left the door open for the rare case in which the issue may be decided as a matter of law. See Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 937 (Fla.2000) (holding that “the question of when the statute of limitations begins to run in this type of case is ‘generally treated as [a] fact question[ ] for a jury to resolve’ ”) (alteration in original) (emphasis added) (quoting Copeland v. Armstrong Cork Co., 447 So.2d 922, 926 (Fla. 3d DCA 1984). “In products liability actions involving latent or creeping diseases, ... ‘[t]he action accrues only when the accumulated effects of the deleterious substance manifest themselves [to the claimant] in a way which supplies some evidence of causal relationship to the manufactured product.’” Carter, 778 So.2d at 937 (quoting Copeland, 447 So.2d at 926 (citations omitted)). In Engle, the Florida Supreme Court explained that “[t]he critical event is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself.” Engle, 945 So.2d at 1276 (second emphasis added).
In conformity with Engle, Carter, and Copeland, the First District in R.J. Reynolds Tobacco v. Jewett, 106 So.3d 465, 472 (Fla. 1st DCA 2012), reversed a jury verdict in favor of an Engle plaintiff who died from COPD based on the failure to provide the jury with the following special jury instruction requested by R.J. Reynolds:
Defendants do not need to prove that Ms. Jewett was actually diagnosed with COPD prior to May 5, 1990, in order to prevail on this defense. For purposes of this defense, the critical event is not when her COPD was actually diagnosed by a physician, but when her COPD first manifested itself.
Ms. Jewett knew or should have known that there was a reasonable possibility that her COPD was caused by cigarette smoking if her COPD manifested itself to her in a way that *608 supplied some evidence of a causal relationship to cigarette smoking. In making that determination, you may properly consider what Ms. Jewett knew prior to May 5, 1990, concerning the health risks of cigarettes.
Id. at 468 (emphasis added).
This Court has also recently addressed the issue of when a smoking-related disease, medical condition, or injury manifests itself for purposes of the limitations period in Engle-progenj lawsuits in Frazier v. Philip Morris USA Inc., 89 So.3d 937 (Fla. 3d DCA 2012). In Frazier, this Court reiterated that the issue was not when Ms. Frazier was actually diagnosed with a smoking-related injury, but rather when the disease or condition manifested itself. Id. at 944. We additionally held that the issue was not when Ms. Frazier developed COPD or emphysema, “the issue was whether she knew, or reasonably should have known, enough to permit her to commence a non-frivolous tort lawsuit against [the tobacco companies] on the basis of those physical, observable, patent symptoms and effects (‘manifestations’) before [the relevant] date.” Id. at 946.
In Frazier, “there was no competent record evidence that ‘the accumulated effects of the substance [had] manifested] in a way which supplie[d to Ms. Frazier] some evidence of the causal relationship to the manufactured product’ before the undisputed limitations bar date of May 5, 1990.” Id. at 939 (alterations in original) (footnote omitted). Specifically, although Ms. Frazier had periodic bouts of bronchitis and pneumonia, neither she nor any of her treating physicians ever suspected they were caused by her cigarette smoking. In fact, she believed on each occasion she simply had a “bad cold” or a short-term infection, and her belief was bolstered by the medical treatment she received. Id. at 940. Upon each visit, Ms. Frazier was prescribed antibiotics, no chest x-rays were performed, and she was not referred to a pulmonologist. Thus, because Ms. Frazier was not put on notice either by her doctors or her symptoms that she may have been suffering from a smoking-related illness or disease until February 1991, her action was not barred by the May 5, 1990, statute of limitations.
In contrast, Mr. Belanger knew by no later than 1981 that the difficulties he was experiencing — shortness of breath, severe coughing episodes, and repeated illnesses — were related to his cigarette smoking. He admits he knew by 1981 that smoking cigarettes was “killing” him. He was so concerned about the seriousness of his medical condition in 1981 that he quit smoking “cold turkey” after having smoked cigarettes for forty-five years. Mr. Belanger testified: “I was in the hotel coughing, choking, and that’s when I was reaching for a cigarette and coughing and I said to myself, how stupid I was, because what I was reaching for was killing me.” In Mr. Belanger’s own words, he did not quit smoking because smoking cigarettes made him cough or sick; rather he quit smoking because he knew that smoking cigarettes was killing him.
Despite quitting smoking in 1981, Mr. Belanger’s health did not improve. He watched his health continue to deteriorate and, by 1985, x-rays revealed scars on his lungs and other changes consistent with COPD. Mr. Belanger knew or should have known what his symptoms meant. He had witnessed firsthand the manifestations of smoking-related illnesses. He watched his mother die of lung cancer, and his father die of a heart disease, both of which he attributed to cigarettes. Despite his symptoms, and his knowledge of what those symptoms meant, he did not seek medical attention or a definitive diagnosis until 1993 when he could not even walk *609 fifty feet, had difficulty breathing even at rest, and was often totally bedridden.
The fact that Mr. Belanger waited until his medical condition had become so dire should neither inure to his benefit, nor protect him from the limitations period. By his own admissions, Mr. Belanger knew by 1981 that cigarettes were killing him, and when his symptoms continued to worsen, based on his own awareness of the causal relationship of his symptoms, his use of cigarettes, and his family history, he knew or should have known that his medical condition was related to his forty-five year history of cigarette smoking. Thus, he should have sought a definitive diagnosis.

IV. CONCLUSION

Based on these undisputed facts, the trial court properly granted R.J. Reynolds’ motion for summary judgment, and therefore, we should affirm the trial court’s order. I, therefore, respectfully dissent from the majority’s opinion.

. The trial court initially certified a nationwide class consisting of "[a]ll United States citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.” Thereafter, this Court affirmed the class certification, but limited the class to Florida citizens and residents. R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. 3d DCA 1996). The Florida Supreme Court decertified the class, but held that qualifying class members can file individual actions, and rely on the findings of fact common to the class members' claims, defining the Engle class members as "[a]ll [Florida] citizens and residents, and their survivors, who have [as of November 21, 1996,] suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.” Engle v. Liggett Group, Inc., 945 So.2d 1246, 1275 (Fla.2006). As the Engle class action was filed in the lower tribunal on May 5, 1994, and Florida has a four-year statute of limitations period for product liability actions, § 95.11(3), Fla. Stat. (1994), an individual's Engle cause of action must have accrued between May 5, 1990, and November 21, 1996, the cut-off date for class membership.

. This is why we have statutes of limitation. See Estate of Eisen v. Philip Morris USA, Inc., 126 So.3d 323, 328 (Fla. 3d DCA 2013) (“The primary purpose of a statute of limitations is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend.”); Ar-velo v. Park Fin. of Broward, Inc., 15 So.3d 660, 663 (Fla. 3d DCA 2009) ("Statutes of limitation are intended to encourage the enforcement of legal remedies before time dilutes memories, witnesses move to greener pastures, and parties pitch out (or “delete,” in this electronic age) old records.”).